CHAMBERS AND COMPANY, a partnership composed of J. J. Chambers and J. J. Chambers, Jr., Appellant,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Appellee.

No. 15256.

United States Court of Appeals Fifth Circuit.

June 30, 1955.

Hoke Smith, W. B. Cody, Atlanta, Ga., Smith, Kilpatrick, Cody, Rogers & Mc-Clatchey, Atlanta, Ga., of counsel, for appellant.

Wm. Hart Sibley, Daniel B. Hodgson, Atlanta, Ga., Warner H. Mendel, New York City, Alston, Sibley, Miller, Spann & Shackelford, Atlanta, Ga., of counsel, for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

Appellant, Chambers and Company, a partnership, sued Appellee, the Equitable Life Assurance Society of the United States, for $60,000.00 and interest as a commission for originating a loan to be made to Statler-Dallas Company, Inc. The contract for the payment of the fee rested in a series of written communications between the three parties named, Statler-Dallas Company, Inc. not being a party to this action. Chambers claimed that it produced for Equitable a borrower (Statler) ready, willing and able to borrow on the terms agreed upon, and that Equitable wrongfully failed and refused to proceed with the loan on those terms.

Equitable admitted that it made a written commitment to make a loan and to pay Chambers one percent commission as the money was advanced, but asserted that the terms of the commitment had not been met when Statler asked an extension of time in which to complete the contemplated hotel building. Equitable was willing to extend the time at an advance of interest rate, but Statler refused the advance and withdrew the application.

Chambers claimed that Equitable waived the completion date provided in the commitment or equitably agreed to an extension by demanding and accepting payments of a stand-by fee of one-fourth of one percent provided in the commitment after it knew that the original completion date could not be met.

Each party filed a motion for summary judgment based upon the pleadings, admissions obtained under Fed.Rules Civ.Proc. rule 36, 28 U.S.C.A., depositions and affidavits, and the rights of the parties are fixed by written instruments which must be interpreted in the light of actions concerning which there is no dispute. The court below denied the Chambers motion for summary judgment and granted Equitable's motion. Chambers is here as appellant seeking to have that judgment set aside.

The transactions in this controversy covered a period of three years beginning July 5, 1950. At that time Chambers wrote Equitable that he represented Statler, which desired to obtain a loan for the construction of a hotel building in Dallas. The hotel was to be constructed by Statler-Dallas Company, Inc., but the loan was to be protected by a long term lease to Statler Hotels Company. This letter requested a commitment from Equitable, "Subject to your company's approval of the plans and specifications". The paragraph of the letter concerning commission reads:

"As I also told you, it would be agreeable to us to accept our one percent origination fee of the original amount of the loan over a period of

five years without interest. This agreement shall provide that yearly payments will cease in the event said loan is not on your books."

Equitable responded promptly to that letter, indicating a favorable attitude to the loan and stating, "As is customary, the commitment letter would be subject to completion per plans and specifications to be approved by the society, and to approval of the lease as finally drafted, etc., and would provide for a stand-by charge of one-fourth of one percent per annum from the date of the commitment letter to the date of closing". Chambers replied making inquiry concerning the stand-by fee, asking if it was customary with large insurance companies; the letter also asked Equitable to confirm the agreement as to origination fee.

Equitable answered that its "consideration of the proposed loan on the new Statler hotel to be erected in Dallas is to be based upon a procurement commission to you of one percent with the Society to elect whether or not it is to be paid to you in cash or over a five year period in installments". It responded also that it had made no sizeable construction loans in the territory for a considerable period of time without collecting a stand-by charge, giving examples of such loans at various Texas points.

After the lapse of several months Chambers wrote Equitable November 22, 1950 in part as follows:

"Confirming our telephone conversation with reference to the loan on the Statler Hotel to be erected in Dallas, Texas, we understand that we are to receive one percent commission for originating this loan. We agreed to pay a minimum of $1500.00 and a maximum of $2,500.-00 for an appraisal of the property. This money is to be deducted from the last payment of the fee we are to receive. It is understood that we are to receive one percent of the monies as advanced by your company. The above is a matter which I will not discuss with the Statler Company."

The senior Chambers testified in a deposition taken by Equitable that this letter of November 22, 1950 was the final agreement as to the payment of the commission which forms the basis of this action.

A week later Equitable sent to Chambers a loan application to be executed by Statler-Dallas Company, Inc. and Chambers sent it along to that company, which was its client. The application was for a loan of six million dollars for twenty years at three and one-half percent interest and with provisions for reductions of the principal commencing four months after the final closing. The application called for advances to be made with minimum amounts specified, each advance to bear interest at three and one-half percent per annum, all to be covered by first mortgage and assignment of lease between the owning company and the hotel operating company. No mention was made in the application of a fee to be paid, and the stand-by charge as provided for in the application is in these words:

"A stand-by charge of one-fourth of one percent per annum, payable quarterly in advance, beginning July 1, 1951 shall be paid on amount committed for and shall continue to be payable on said total amount until advances are made. As advances are made, stand-by interest will cease on amounts advanced and regular interest, as aforesaid, shall commence to accrue. At final closing, the stand-by fee payments shall be adjusted to reimburse applicant for any payments made thereon on monies not drawn down by date of final closing."

Equitable issued what is termed a "Memorandum of Procedure" bearing date of June 6, 1951, but evidently not delivered until two months later. The stand-by fee is provided for in the last paragraph of that document, which all parties to this litigation accept as a binding commitment of Equitable, in these words:

"In addition, the company is to pay to the Society for the period

commencing July 1, 1951, and ending with the date of the final disbursement of the loan, a stand-by fee at the rate of one-fourth percent per annum on that portion of the loan which remains from time to time undisbursed. This fee will be payable at the end of each quarter commencing October 1, 1951 with final payment to be made on the date of last disbursement."

The parties to the commitment were Equitable and Statler-Dallas Company, Inc., Chambers not being a party. Statler-Dallas Company, Inc. was bound by the terms of this commitment to deliver to Equitable the usual notes and mortgage agreements, the twenty-year lease with Hotels Statler Company, insurance policies and other papers customary in closing such transactions. Among the documents Statler was obligated to deliver was a Building Loan Agreement provided for in this language:

"This agreement will, among other things, contain the undertaking of the company to complete the erection of the hotel building and other improvements and to accept the final disbursement of the loan on or before January 1st, 1954, unless extended by mutual consent, and will provide for the manner in which all such advances will be made by the Society from time to time. * * "

Some eight months after the commitment was issued Chambers wrote Equitable a letter asking that the amount of the original loan commitment be increased. Equitable replied, under date of March 19, 1952, advising that it would be glad to try to arrange an increased loan, but stating that it was afraid that Regulation X "throws a monkey wrench into this situation". It suggested that efforts be made to exempt the Dallas hotel from the provisions of that regulation, but doubted that such a venture would be successful. The letter further stated that, if an increase could be arranged, "The additional money we would commit would have to bear a higher rate than the money now committed for".

The letter further stated, "No doubt it will take eighteen months to build this hotel building and perhaps long before the building is completed, Regulation X will no longer be effective", so that Statler might be able to increase the size of the hotel, as was then in contemplation. It appears from the Chambers deposition that a later letter was received by him from Equitable in which it was stated, "It is our understanding that if this loan is increased no commission will be payable to your firm on the amount of the increase of the original six million dollars approved by the Equitable".

The record does not reflect any further activity in connection with the dealings between the parties between March 19, 1952 and August 12, 1953, except Equitable had been demanding and Statler had been paying the stand-by fee according to the terms of the commitment, to and including the fee of $3,750.00 due July 1, 1953 for the second quarter of 1953. The affidavits of the Chambers show that, on June 29, 1953, they had a 'phone conversation with representatives of Equitable in which it was discussed that work had not been begun on the hotel and probably would not start until sometime in August following. August 12, 1953 the president of Hotels Statler Company, which was to be lessee of the hotel, wrote the Dallas office of Equitable, with copy to Chambers, as follows:

"I am glad to advise that our board of directors today voted unanimously to accept the bid of the lowest contractor * * * for the construction of Hotel Statler, Dallas. They voted also to accept your loan commitment for a first mortgage loan of Six Million Dollars at three and one-half percent interest, pursuant to the memorandum of procedure heretofore agreed upon * * * We have been delayed in starting construction due to a number of unavoidable circumstances, such as changing architects, changing architects' plans and specifications, revisions made necessary by the building department, delay of contractors

in submitting bids, etc. However, we expect to proceed promptly and to break ground sometime during the middle of September.

"As you know, we have been paying stand-by interest on the loan commitment for a number of years. The last payment we made was on July 1st of this year, pursuant to a bill that you sent us. I note that the memorandum of procedure provides for completion of the hotel by January 1, 1954. Of course, that is impossible. However, I would not expect that you would insist on that requirement now, particularly in view of the fact that you have been billing us for and we have been paying stand-by interest regularly. We also would expect to continue to pay stand-by interest during the period of construction on funds not advanced."

This letter was followed by one of August 13th written by the vice-president of the same company to the New York office of Equitable repeating what was said in the letter of the previous day and adding: "The Memorandum of Procedure * * * indicates that the erection of the hotel building and the final disbursement under the loan would be completed by January 1, 1954 unless extended by mutual consent. It is our request that the extension be made to January 1, 1956".[1]

Chambers, who had received a copy of the letter of August 12, wrote Equitable August 21, 1953 the following:

"As you know the Statler Company has been paying the Society a stand-by fee for two years on the above loan. Inasmuch as the Society accepted stand-by fees through July 1, 1953 and it is physically impossible to complete this hotel by January 1, 1954 I believe it would be well for you to consider returning at least one year's stand-by fee

which amounts to $15,000.00. It takes approximately two years to build a hotel of this size, and the stand-by fee has been paid although it was not possible to meet the deadline of January 1, 1954, eighteen months ago. I would appreciate your consideration in this matter and advising me at 811 Grant Building, Atlanta, Georgia as soon as possible how the Society feels about this matter."

Equitable replied August 25th, four days later, by telegram advising Chambers, "Committee did not approve any refund of stand-by fee Statler-Dallas commitment".

The chronology of the parties' actions in these last crucial days is significant: August 12th, Statler explained its long delay, advised that it was ready to begin construction and emphasized the payments of stand-by interest it had made, adverting also to its intention to continue such payments until the time of actual disbursements under the contemplated loan; August 13th, Statler requested a two-year extension with respect to the completion date; Equitable offered (date not shown) to grant the extension provided the interest rate was increased by one-half of one percent; August 21st, Chambers wrote Equitable requesting, not that the extension be granted nor that its fee, now sued for, be paid, but that a portion of the stand-by fee be returned to Statler; August 25th, Equitable wired Chambers failing to acquiesce in the requested refund; and August 26th, Statler "cancelled the commitment and, presumably, obtained financing elsewhere".

Statler has made no claim against Equitable and was evidently content to reject Equitable's offer to go ahead with the loan at a higher rate of interest and to "obtain financing elsewhere". Chambers is here as Appellant claiming that the facts outlined above established its claim to a one percent commission on the

1. Equitable's commitment was to Statler-Dallas Co. and it does not appear why Hotels Statler Company, which was to be lessee of the planned hotel, wrote this letter and that of August 12, supra.

amount of the loan covered by Equitable's conditional commitment. It is clear that Appellant's contract for a commission was a conditional contract, contingent on the actual making of the loan from Equitable to Statler. That is explicit in each of the writings on which Chambers relies as establishing the contract.

The obligation of Equitable to make the loan was likewise contingent. Statler had to make arrangements to build the hotel and to lease it to a solvent concern under terms satisfactory to Equitable. It is too clear for argument, therefore, that Appellant has no possible right of recovery unless its right is based upon the claim that it produced a borrower ready, willing and able to go ahead with the loan, and that Equitable wrongfully and illegally refused to make the loan.

Presumably this is the theory upon which recovery is sought, the contention of Appellant being thus stated: " * * The Appellee, by its conduct, * * either waived the time requirements in its loan commitment, or by its conduct impliedly extended the period of the continuity of the loan commitment * * * and, because of the waiver or extension the Appellee was unjustified in its refusal to go through with its commitment, resulting in an unjustified deprivation of Appellant's earned commission".

Appellant's argument revolves largely around the contract provisions for the stand-by fee and Equitable's insistence upon collection of that fee according to the terms of the contract. We are unable to follow this argument, both because Equitable never did refuse to make the loan or to extend the time limit, and because its contract with Statler provided for payment of the stand-by fee and Equitable was merely claiming performance of its contract when it exacted payment of the stand-by fee. It is implicit from Appellant's argument that it is claimed that this fee represented something which was unconscionable if not illegal. We are not impressed by that argument.

Equitable was an insurance company. Its business was to accept in trust deposits of money from persons desiring insurance on their lives and to put that money to work for the benefit of those persons and the profit of Equitable. The only way in which it could serve those purposes was to hire out the money it had collected for a stated reward. Statler desired to borrow money to construct a hotel and Equitable was willing to lend the money, and Chambers brought the two together and was entitled to be paid its fee by Equitable if and when Equitable made a loan to Statler.

Equitable understood that Statler would have to construct the hotel and set it into operation under an acceptable lease contract, and it therefore committed itself to make the loan upon stated terms and allowed a time limit of nearly two and one-half years. Statler evidently liked that time limit because it readily agreed to the terms of the commitment.

Equitable was compelled to have this Six Million Dollars in hand the moment it executed the commitment. From that time forward Statler had a right to demand the money whenever it was ready to perform the conditions laid down in the commitment. Interest on the planned loan was not to begin until advances were actually made for the construction of the hotel. Is it argued that Equitable was compelled to hold that large amount of money in idleness during this period of more than two years, during which time Statler had the option to borrow the money or to fail to borrow it as it pleased? Equitable was willing to keep the money available for the modest fee of one-fourth of one percent, and Statler was willing to pay that fee to insure that Six Million Dollars would be ready for its uses when needed. The parties had a right to make that contract and they did make it and the contract is not illegal in any respect. Statler had the right, any time it desired, to stop paying this stand-by fee. While Equitable was obligated to lend, Statler was not obligated to borrow. The only consideration moving to Equitable was the payment of

this stand-by fee, and Statler had the option to terminate the arrangement any time it desired to stop making the payments.

We are unable to follow Appellant's argument that it was Equitable's duty to stop demanding and receiving this modest fee which Statler had freely contracted to pay at that point of time when it became obvious to Equitable that Statler could not complete the hotel by January 1, 1954. In so doing Equitable was merely calling for performance of the contract. Statler was in complete control of the situation. Statler alone could let the contracts and build the hotel, could move swiftly or sluggishly. It was Statler which changed the original plans and decided to attempt a larger construction, which had all the dealings with the architects and contractors. Equitable had nothing to do with any of those things. It was Statler's duty to watch the time limit and to begin negotiations for an extension when it appeared that the original time limit was not sufficient.

Appellant stresses that Equitable was demanding payment of the stand-by fee July 1, 1953, just six months before the completion date of the hotel, as provided in the contract. We perceive nothing illegal or immoral in that. The fee had been earned under the terms of the contract and Statler, possessing always the right to surrender the commitment by refusing to make the payment, was evidently content to pay this small fee to keep the money available. It is pertinent to recall that, on March 19, 1952, Equitable had written Chambers that it would doubtless take eighteen months to two years to build the hotel and expressing great doubt as to whether the expanded building program Statler then had under consideration could be financed under federal regulations. That letter also put Chambers on notice that a higher interest rate was in prospect: "I am sure that if we could be of added service to him, the additional money we would commit would have to bear a higher rate than the money now committed for".

The record shows without dispute, not only that Equitable never at any time refused to make the loan to Statler, but also that Equitable did not fail or refuse to negotiate concerning an extension of time for the completion of the hotel. When approached by Statler for an extension, it countered immediately with an offer to "grant such extension provided the rate of interest to be paid on said loan was increased from three and one-half percent to four percent per annum."

Under the contract Equitable was not obligated to make the loan unless the hotel could be completed by January 1, 1954. The contract further contained the provision that this time limit would apply "unless extended by mutual consent". Assuming that the duty rested upon Equitable to conduct reasonable negotiations for an extension, there is no evidence whatever that Equitable was not willing to do this. Its offer to extend the completion date upon a small advance of interest rate was, as far as the record goes, a good faith effort to negotiate for the extension. It is common knowledge that the money market is subject to fluctuations resulting, not alone from economic laws, but from governmental fiat; and, for aught that appears to the contrary, money was worth more the middle of August, 1953 than it had been in June, 1951. That idea is buttressed by the letter Equitable wrote Chambers March 19, 1952 above referred to.

It is clear that Equitable did nothing to indicate that it was declining to grant an extension. All it did was to make an offer looking towards an extension. The words of the commitment carried the idea that the terms of an extension would vary from those contained in the initial commitment. Equitable was merely negotiating. This was in harmony with what Chambers was doing. In its letter written a few days after Equitable had suggested the higher interest rate, the plea was made that Equitable "consider returning at least one year's stand-by fee". The tone of that letter indicates that Chambers was advised that Statler

was prepared to get the money elsewhere. Appellant was not pleading with Equitable to grant an extension, and certainly was not putting Equitable on notice that it was intending to demand the payment of a fee. It was merely arguing for a return of some of the stand-by money, and closed with the statement, "I would appreciate your consideration in this matter". The implications of that letter are quite at variance with the contentions now being asserted by Appellant.

At all events, while Statler was negotiating for an extension of time and Chambers was negotiating for a return of some of the stand-by fee Equitable had collected, and Equitable was negotiating for a slight advance in the interest rate, Statler "cancelled the commitment and, presumably, obtained financing elsewhere". In other words, while all parties were presumably striving in good faith for a "mutual consent", Statler chose to cancel all negotiations and to get its money elsewhere. Statler had raised no question about the right of Equitable to collect the stand-by fee as recompense for holding this large sum of money subject to its call.

On these facts Appellant seeks to predicate a waiver by Equitable of the time limit contained in the commitment. We cannot agree. A waiver is an intentional relinquishment or abandonment of a known right or privilege[2]. The right, privilege or advantage allegedly waived must be in existence and be known to exist by the party possessing it, and this party must intentionally and voluntarily relinquish such right, advantage or benefit[3]. Moreover, a waiver must be supported by an agreement founded on a valuable consideration[4].

Nothing in this record furnishes these ingredients of waiver. The only conduct to which such a result is ascribed is the acceptance of the stand-by fee, and this action was within the plain terms of the contract. Moreover, such acceptance has no tendency to establish any intention on the part of Equitable to give up any right vouchsafed to it by the contract. Equitable was merely carrying out the terms of the contract.

Even if there were elements of waiver or if the proof were such that a court of equity might hold Equitable to an extension of the deadline, it is difficult to perceive how this would improve Appellant's position in this civil action. Statler did not claim that an extension had been effected or that Equitable's conduct amounted to a waiver. Statler took just the opposite view and requested an extension. Before the parties could have a discussion looking towards extension by mutual consent, Statler walked off and left the discussions in progress and cancelled the commitment, choosing to get its money elsewhere. Whatever rights Appellant has derived from Statler and its ability to force performance by Equitable. Statler has claimed no such rights, has sought no such performance, but on the other hand has abandoned any claim it might have had against Equitable.[5] It is clear, therefore, from the record before us that Appellant has no case.

But it is suggested that it was error for the court below to grant Appellee's motion for summary judgment and that we should reverse and remand the case for trial on the merits. Both parties filed and argued motions for summary judgment, but this does not warrant the granting of either motion if the record reflects a genuine issue of fact. Walling v. Richmond Screw Anchor Co., 2 Cir., 1946, 154 F.2d 780; certiorari denied 328 U.S. 870, 66 S.Ct. 1383, 90 L. Ed. 1640; 6 Moore's Federal Practice, Par. 56.13, P. 2092.

[6, 7] But this record shows that there is no genuine issue as to any material fact. The rights of the parties are fixed by writings very largely, and the

---

**2.** Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.

**3.** 56 Am.Jur.Waiver, Sec. 12, P. 113.

**4.** Ib. Sec. 16, P. 116.

**5.** Cf. Groover v. Goldstein, 38 Ga.App. 613, 144 S.E. 830, citing Hanesley v. Bagley, 109 Ga. 346, 34 S.E. 584.

facts set forth in the depositions and affidavits do not disclose or point to any material conflict. Under these circumstances summary judgment was proper, it being the genius of Rule 56, Federal Rules of Civil Procedure to provide a simple and inexpensive means for putting an end to litigation if there is no genuine issue as to any material fact.[6]

We are not tempted to follow the suggestion that the case should be sent back to the lower court for trial with the thought that the parties might mend their fences and develop an issue of fact not reflected in the record before us. The issues between the parties were defined by complaint and answer, Appellant introduced the writings it conceived to be pertinent by request for admissions, both partners constituting Appellant partnership testified by affidavit and the senior partner by deposition, and each party filed a motion for summary judgment specifying the reasons for its assertion that there was no genuine issue as to any material fact.

█ It will not do to say that Appellant might bring forward other evidence in the way of writings or proof of circumstances over and above those disclosed by the admissions, depositions and affidavits filed in connection with the motions for summary judgment, from which it might be inferred that Appellant was able to make a stronger case than that reflected in this record[7]. It was not permissible that Appellant hold back any evidence or fail to make a full disclosure of the facts upon which it relied for recovery. Disclosure under summary judgment must be full and complete[8].

Ample machinery is provided in Rule 56(f) to prevent injustice, it being there provided that, if a litigant sets forth reasons why he cannot produce facts thought to be essential, he may make a proper showing to the court to the end that such steps may be taken as to insure that summary judgment is not granted where there is a reasonable probability that an issue of fact may be developed. As demonstrated in the notes, however, there is no showing at all here that Appellant has been prejudiced by a disposition of the case on summary judgment, or that any further evidence could be introduced in a trial on the merits. Under these circumstances the case was clearly one for summary judgment.

It appearing that the judgment of the court below was correct, it is

Affirmed.

RIVES, Circuit Judge, concurs specially.

RIVES, Circuit Judge (concurring specially).

I concur in the result, and in much but not all of the able and comprehensive opinion of the majority. To me, it seems that the record presents a close question as to whether the case should have been disposed of by summary judgment or by

6. Rule 56, F.R.C.P.; 6 Moore's Federal Practice, P. 2028, et seq.; Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967; Whitaker v. Coleman, 5 Cir., 1940, 115 F.2d 305.

7. Appellant does not point out any additional proof which may be available and this record reflects what may be termed a typical case for summary judgment. After Equitable had filed its answer to the complaint, Chambers promptly served its request for admissions, placing in the records the main documents defining the rights of the parties and developing certain facts presumably thought important. Equitable had already taken the deposition of Chambers, Sr., who was examined both by Equitable's counsel and his own. Equitable then filed its motion for summary judgment, serving with it the affidavit of its vice-president. Appellant promptly filed and served affidavits of its partners along with its own motion for summary judgment. Neither party points to any writing or any testimony which might fortify its position, and it is apparent that all of the facts are before the court as fully as if they had been developed in an extensive hearing.

8. Surkin v. Charteris, 5 Cir., 1952, 197 F.2d 77; American Ins. Co. v. Gentile Bros. Co., 5 Cir., 1940, 109 F.2d 732; Whitaker v. Coleman, 5 Cir., 1940, 115 F.2d 305.

a trial on the merits, as to whether the evidence leaves open fair inferences favorable to the appellant, enough to make a genuine issue of fact. See Fox v. Johnson & Wimsatt, 75 U.S.App.D.C. 211, 127 F.2d 729, 736; Paul E. Hawkinson Co. v. Dennis, 5 Cir., 166 F.2d 61, 63; Surkin v. Charteris, 5 Cir., 197 F.2d 77, 79; Loew's, Inc., v. Bays, 5 Cir., 209 F.2d 610, 615.

I do not understand appellant to argue that the stand-by fee was inherently unconscionable or illegal. My understanding of its contention is that Equitable's conduct in continuing not merely to accept, but actively to urge, the payment of the stand-by fee after it knew that the deadline could not be met amounted either to a waiver or to an agreement for such extension of time as might be reasonably necessary to complete the hotel.

Nor can I agree that when Equitable offered to grant a written extension, provided the interest rate was increased from 3½% to 4%, that it did not thereby refuse to extend the time limit under the contract. It seems to me that Equitable was then offering to substitute a different loan agreement for the one to which it was already committed. Obviously, I think, Statler was paying a $15,000.00 annual stand-by fee for a binding loan commitment, not for the mere privilege of negotiating with Equitable.

Further, I disagree with the position, which I understand the majority to take, that appellant is precluded from any right of recovery because Statler has abandoned any claim it might have had against Equitable. Entering into such a large undertaking, Statler, long before contracting for the erection of the hotel building, took the wise precaution to secure a definite and binding loan commitment. When Equitable refused to enter into a written extension at the agreed interest rate of 3½%, it may not have been good business for Statler to litigate. Instead, it chose to get its loan from another source. That action did not preclude appellant from collecting its commission if Equitable had in fact waived the deadline or consented by its conduct to an extension.

Nor do I think that appellant's rights were prejudiced by its unsuccessful plea on behalf of Statler that Equitable "consider returning at least one year's stand-by fee." No objection has been made to appellant's dual representation of both Statler and Equitable. Appellant may well have considered that it owed a duty to Statler, its original client, to urge Equitable to refund at least one year's stand-by fee amounting to $15,000.00, received by Equitable after it became obvious to all that meeting the deadline was an impossibility.

My concurrence in the result rests upon a much narrower basis. I think that the circumstances under which Equitable urged the continued payment of the stand-by fee expressly negative any inference otherwise permissible of a waiver of the deadline or of a binding agreement to an extension of time of the definite loan commitment. Those circumstances are best evidenced by the letter written by Chambers at the time with reference to the stand-by fee due July 1, 1953:

"June 29, 1953
"Mr. Arthur F. Douglas, President,
"Hotels Statler Company, Inc.,
"Hotel Statler,
"New York, N.Y.
"Re: Dallas Statler Hotel Loan,
Dallas, Texas.
"Dear Arthur:
"We talked to Eddie Maher in Dallas and he in turn called the New York Office and called us back.
"He now understands your circumstances and asked us to tell you that everybody concerned wants to work out the loan and Mr. Maher feels sure it will be done. He did suggest that you work as fast as possible and that the standby fee due July 1st be paid.
"With best wishes,
"Sincerely yours,
"J. J. Chambers.
"JJC:mcb"

The message which Equitable asked appellant to convey to Statler was not that the deadline had been waived or an extension agreed on, but simply that, " * * everybody concerned wants to work out the loan and Mr. Maher feels sure it will be done." This was, I think, express notice that no definite understanding had been reached but that one would have to be "worked out." Under such circumstances, I think that Equitable was justified in re-entering the negotiation stage and offering to grant the written extension at an increased interest rate. For that reason, no fair inference remained open that by its conduct Equitable had waived the deadline or had consented to an extension of time. I, therefore, concur specially.