**GEORGIA, SOUTHERN AND FLORIDA RAILWAY COMPANY**

v.

**UNITED STATES CASUALTY COMPANY.**

**Civ. A. No. 1521.**

United States District Court
M. D. Georgia,
Macon Division.

Feb. 2, 1959.

Bloch, Hall, Groover & Hawkins, Macon, Ga., for plaintiff.

Martin, Snow, Grant & Napier, Macon, Ga., for defendant.

BOOTLE, District Judge.

On February 13, 1953 Charles McKinnon, while employed by H. M. Pafford, Jr., drove a dirt moving machine into the side of a train of the plaintiff, Georgia, Southern and Florida Railway Company, and in consequence was killed. This occurred at a temporary grade crossing over the track of petitioner established for the convenience of Pafford, a contractor who under contract with the Highway Department of the State of Georgia was building nearby an overpass over petitioner's track. The immediate cause of the tragedy was the negligence of one George Moore, a flagman at said temporary grade crossing.

A short time after the fatal accident an extended exchange of communications took place between counsel employed by McKinnon's widow to enforce her claim for her husband's death, counsel for the Railway and counsel for the defendant, United States Casualty Company, the Railway's insurer. This extended exchange represented the efforts of the widow to urge a claim against the Railway, the Railway's efforts to gain protection under an insurance policy issued in its favor by the insurer, and the insurer's denial to the Railway of coverage under said policy.

At the end of this exchange and some time after the widow had filed in a state court a suit against the Railway to enforce her claim, the Railway instituted litigation which began a long familiarity on the part of this court and Georgia state courts with the facts and issues in this case.

After the insurer had denied coverage and the widow's suit against the Railway had been instituted, the Railway filed in Bibb Superior Court a suit for declaratory judgment seeking, *inter alia*, a declaration of its rights under the policy in question and under a certain bond signed by this defendant as surety and by H. M. Pafford, Jr., as principal. The insurer, one of the defendants in that suit, removed that case to this court where the court noted a lack of jurisdiction—the presence of Pafford as a defendant destroying diversity and there being no separate and independent claim or cause of action existing as to the Railway and the insurer—and remanded the case to the court in which it originated. There, a hearing on demurrers and motion for judgment on the pleadings and admissions of fact resulted in a judgment reciting, *inter alia*, that the policy in question afforded coverage to the Railway.

That decision was appealed to the Supreme Court of Georgia which found it had no jurisdiction and transferred the case to the Court of Appeals of Georgia. United States Casualty Co. v. Georgia, Southern & Florida Ry. Co., 1956, 212 Ga. 569, 94 S.E.2d 422.

The Court of Appeals of Georgia reversed the trial court holding that the rights of the parties accrued at the time of the accidental death of McKinnon and that, therefore, under the Georgia law the granting of a declaratory judgment was error. United States Casualty Co. v. Georgia Southern & Florida Ry. Co., 1957, 95 Ga.App. 100, 97 S.E.2d 185.

Following that reversal the plaintiff amended its petition in the trial court, and the case was dismissed upon demurrer. That decision was appealed. On this appeal it was held that the amendments did not make the case one for declaratory judgment, but the court also held that an insurer otherwise liable declining defense of a suit under a policy is bound by a good faith settlement of the suit. Georgia Southern & Florida Ry. Co. v. United States Casualty Co., 1958, 97 Ga.App. 242, 102 S.E.2d 500.

Following this last decision the Railway settled the action Mrs. McKinnon was prosecuting against it and then brought this action against the insurer in the Superior Court of Bibb County, Georgia praying for damages representing the settlement with attendant costs ($7,511.75), reasonable attorney's fees resulting from Mrs. McKinnon's suit ($3,000), 25% of the foregoing sums as damages ($2,627.93) and reasonable attorney's fees resulting from the instant suit ($1,500).

The insurer removed the cause to this court and filed an answer to the petition. Following the defendant's answer both parties filed motions for summary judgment; it is on these cross-motions for summary judgment that this memorandum is being written.

■ The issue is whether the insurance policy procured by the contractor, Pafford, in favor of the Railway and issued by the defendant affords protection to the Railway with respect to the fatal accident of McKinnon. The resolution of this issue must be found in a construction of the insurance contract. In Georgia the construction of a contract is a question of law for the court unless some matter of fact is involved. Ga.Code Ann. § 20–701.

The contract in question in this suit is sufficiently ambiguous to justify a consideration of the facts and circumstances surrounding its execution. Ga. Code Ann. § 20–704, subd. 1; Rea Construction Co. v. B. B. McCormick & Sons, Inc., 5 Cir., 1958, 255 F.2d 257. The contract in its pertinent parts reads as follows:

"Declarations

Item 1. Name of insured Georgia Southern and Florida Railway Company

Address Washington, D. C.
(No. Street        Town or City        County        State)

Location of Premises Ga. Project FGG 001-1(1) Tift County, Georgia
(Enter 'same' if same location as above address)

Interest of named insured in premises Owner Part occupied by named insured
(Enter 'Owner', 'General Lessee' or 'Tenant')

The business of the named insured is Railroad

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

"1. Coverage A—Bodily Injury Liability

"To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of the hazards hereinafter defined.

"Coverage B—Property Damage Liability

"To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined.

"Definition of Hazards

"Division 1. Premises—Operations. The ownership, maintenance or use of the premises, and all operations which are necessary or incidental thereto.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"In consideration of the premium provided for and notwithstanding anything to the contrary contained in the policy and endorsement to which this endorsement is attached, it is hereby understood and agreed:

"1. That this policy and endorsement thereto are hereby extended to cover all loss from the liability imposed upon the insured by law, for damages for bodily injuries (including death at any time resulting therefore) suffered or alleged to have been suffered during the term of this policy, by any person or persons, (including employees of the insured), and any injury to or destruction of property (including property leased, occupied or used by, or in the care, custody or control of the insured or any of its employees) resulting from or in any manner growing out of the operations, acts, or omissions of any contractor or sub-contractor, his agents or employees, by reason of the prosecution of the work described in this policy.

"2. That the Insurance Company will defend in the name of and on behalf of the insured any such claim for damages against the insured, whether groundless or not.

"3. It is understood that this policy and the endorsements thereto do not cover the insured's liability resulting from his own negligence in connection with any direct operation performed by it on the project referred to in this policy.

"4. It is understood that the word 'Contractor' as used in this endorsement refers to the contractor named in the contract covering the construction of the project referred to in this policy, and the word 'Sub-contractor' as herein used refers to the sub-contractor of the aforesaid contractor.

"5. Premium to be paid by the Contractor, with release to the Railway company from obligations for all premium payments imposed upon the insured."

———◆———

There is within the policy no definition of the phrase "direct operation \* \* \* on the project" contained in exclusionary clause 3 of the endorsement. To this phrase counsel for respective parties attach different meanings. Counsel for the insurer claim that "direct" is not meant to restrict the exclusionary language, that it means no more than "any operation" of the Railway on the project and that any operation is direct. The Railway on the other hand insists that "direct operation" means only those operations which the Railway is called upon by the State Highway Department to do pursuant to

a direct agreement between the Highway Department and the Railway.

■■ Inasmuch as the facts and circumstances surrounding the issuance of the policy are to be considered, it must be ascertained whether there is any genuine issue as to any material fact. A summary judgment is properly granted when the pleadings, depositions, and admissions together with whatever affidavits have been filed for consideration show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56, 28 U.S.C.A. The absence of a genuine issue as to any material fact is not established simply because cross-motions for summary judgment have been filed, each alleging such absence. Chambers & Co. v. Equitable Life Assurance Soc., 5 Cir., 1955, 224 F.2d 338, 345.

The pleadings, admissions of fact and affidavits comprising the record of this case present no conflict as to any *material* issue of fact. The parties differ as to their intention as to policy coverage and as to whose servant the flagman was at the time of the accident. If any additional showing could be made to develop other differences the duty was on each litigant to make a full disclosure of all the facts upon which it relied. Chambers & Co. v. Equitable Life Assurance Soc., supra.

As a practical matter it would be difficult to see how any material feature of the case can be left undisclosed after nearly five years of controversy and litigation, a proliferation of pleadings, 10 affidavits and nearly 100 pages of briefs, all prepared with care and precision by competent and experienced counsel.

Briefly the evidence is this: In early 1952 the State of Georgia gained the permission and consent of the Railway to build an overpass over the Railway's tracks in Tift County, Georgia; near the site of the proposed overpass there already existed an overpass which had been built through the combined efforts and financing of the State of Georgia and the Railway; because there was an already existing structure the Railway would not benefit by the new construction and was therefore in the position of consenting and cooperating in the construction rather than sharing the responsibility; the Highway Department of the State of Georgia and the Railway signed a contract on June 17, 1952, looking to the construction of this new highway bridge; prior to the signing of this contract the Highway Department had tendered for approval of the Railway the special provisions for construction of the project, which was to be known as Georgia Project FFG–001–1(1), Tift County, the special provisions for flagging for the project, and another document not bearing a title but providing for the insurance which the contractor building the project would furnish (these documents are exhibits B, C and D to the complaint in this suit); the provision regarding insurance was changed by the Railway in only one respect; namely, as submitted to the Railway, exclusionary clause 3 did not include its concluding phrase "in connection with any direct operation performed by it on the project referred to in this policy", and this phrase was added by the Railway; the changed provision was included in the contract between the Railway and the Highway Department; this contract between the Railway and the Highway Department in its paragraph 5 provided that the Railway would do certain work on the project consisting of making changes in or adjustments of its facilities as described in a detailed estimate dated May 28, 1952, and in its paragraphs 6 and 7 provided that the State would pay the Railway for such work in accordance with the provisions of a certain Administrative Memorandum of the Bureau of Public Roads, and this work was done on the project by the Railway as contemplated by the estimate of May 28, 1952, and by the contract of June 17, 1952; bids were received on the project, and H. M. Pafford, Jr. was low bidder; his contract with the Highway Department required that he procure the insurance provided for in the

contract between the Highway Department and the Railway; Pafford was also bound to the plans and specifications for the project, the special provisions for construction, and special provisions for flagging; Pafford, without making written application therefor, procured from the United States Casualty Company, defendant insurer, policy No. SM 544705 naming the Railway as the insured and bearing an endorsement or rider in the wording required by the construction contract; the policy was for one year, August 25, 1952 to August 25, 1953; before issuing the policy the insurer acquainted itself with all the special provisions referred to above but did not know that by the estimate of May 28, 1952, and the contract of June 17, 1952, the Railway and the Highway Department had agreed that the Railway would do certain work on the project; from its familiarity with one of said special provisions, however, the insurer knew that the Railway would probably provide flagging service and that under the special provisions for construction the Railway could move or require the contractor to move materials and equipment improperly stored on the right of way, that the contractor before placing any obstruction over a track would await the Railway engineer's assurance that temporary bridge warners had been erected or would not be required and would await assurance that the Railway engineer had made arrangements for inspection and flagging service necessary to protect railway traffic, and that contractor was bound to cooperate with others participating in the construction of the project.

The liability of the insurer for the claim of McKinnon's widow as paid by the Railway is settled as a matter of law if there is coverage under the policy. Georgia Southern & Florida Ry. Co. v. United States Casualty Co., supra.

The question of the agency of the flagman whose negligence caused the fatal accident is in dispute, but that question is not material to a decision of this case.

The parties differ as to the legal inferences which may be drawn from the recited undisputed facts. The Railway contends that the language in the special provision for insurance was changed to afford broader coverage and that under the policy only those operations which it undertakes under contract with the Highway Department on the project are "direct operation(s)" contemplated by the exclusionary language of paragraph 3 of the policy endorsement. The Railway contends, therefore, that if it was not under contract with the Highway Department for this service it was not engaged in a direct operation on the project and is covered by the policy notwithstanding the exclusionary clause.

The insurer says there is no coverage because the Railway was not insured against its own negligence and all operations of the Railway on the project are direct. It says further that flagging service was the only service it knew the Railway was to perform on the project, and that, therefore, flagging service must be considered a direct operation on the project and excluded from coverage by paragraph 3.

■ Inasmuch as presumably all of the facts and circumstances have been made to appear in support of the motions under consideration the question of law presented, whether complex or not, will not bar a decision on these motions for summary judgment. Palmer v. Chamberlin, 5 Cir., 1951, 191 F.2d 532, 540, 27 A.L.R.2d 416.

■ The Railway can be insured against its own negligence, and such insurance is not in contravention of public policy. Hartford Fire Ins. Co. v. Chicago, M. & St. P. R. Co., 1899, 175 U.S. 91, 20 S.Ct. 33, 44 L.Ed. 84; Indemnity Insurance Co. of North America v. Koontz-Wagner Electric Co., 7 Cir., 1956, 233 F.2d 380; Thomas v. Atlantic Coast Line R. Co., 5 Cir., 1953, 201 F.2d 167; Phillipine Air Lines, Inc. v. Texas Engineering & Manufacturing Co., Inc., 5 Cir., 1950, 181 F.2d 923; Employers Casualty Co. v. Howard P. Foley Co., Inc., 5 Cir., 1947, 158 F.2d 363; Louisville & N. R. Co. v. Atlantic Co., 1942, 66 Ga.App. 791, 19 S.E.2d 364; Liberty Mutual Insurance Co. v. Atlantic Coast Line R. Co., 1942, 66 Ga.App. 826, 19

S.E.2d 377. The contention that all operations on the project by the Railway are direct operations overlooks the fact that without the word "direct" the exclusionary clause would read: "any operation performed by it on the project * * *". Inasmuch as every word of the contract must be given a meaning if possible for the reason that the parties must have intended a meaning to be attached to each word, "any direct operation" must be narrower than "any operation". Fisher v. American Casualty Co., 1942, 194 Ga. 157, 21 S.E.2d 68; Marbut v. Empire Life Insurance Co., 1915, 143 Ga. 654, 85 S.E. 834; 13 Appleman Insurance Law and Practice sec. 7383 (1943).

It will not do for the insurer to say that at the time of the issuance of the policy it had no knowledge of any work to be done by the Railway on the project other than the flagging service and that therefore the rendition of this flagging service must be looked upon as a direct operation. For the purpose of these motions we accept it as a fact that, when the policy was issued, the insurer did not know that the Railway was going to do any work on the project except the flagging service. We accept it as a fact also, as the vice president and an underwriting employee of the insurer deposed, that the insurer knew nothing of the Railway's doing any work on the project until after the fatal accident. The insurer acquainted itself, however, with all of the special provisions, and as has been indicated above the special provisions for construction clearly contemplated the possibility that the Railway would do other things and perform other activities in connection with the project. For example, the special provisions for construction in one sentence say: "The contractor shall cooperate with others participating in the construction of the project, to the end that all work may be carried on to the best advantage." The insurer would not be warranted in assuming that the Railway would not be one of these "others" participating in the construction of the project.

The manner in which the policy was procured and issued helps identify the risk which it was intended to cover.

The affidavits of the Railway are not contradicted by the insurer; they show that the terms of the policy in question were required to be in the policy which the contractor furnished to protect the Railway. This is the reason for the language's being in the policy. It is true that the Railway was given an opportunity to comment upon and edit the provision, but the provision was imposed by the Highway Department. This fact is particularly significant when it is remembered that the Railway was not to benefit from the project and was, therefore, not to share in the burdens of construction. The requirement of the special insurance imposed by the Highway Department was that the Railway be protected from any loss which it might suffer because of the imposition upon it of an increased risk in operating through the project area because of the very existence of the project. Put somewhat differently, the Railway was to be protected from any loss it would suffer because of any risk greater than its exposure in regular or normal operations.

The Railway was not to be protected from losses occasioned by risks which it assumed voluntarily, apart from its exposure resultant from the imposition of the project upon it.

Thus, the parties intended that any operation which the Railway undertook as a protective measure to shield itself from the increased risk imposed upon it would be covered by the policy.

Under this construction and without undertaking any exhaustive definition of the word "direct" or words "direct operation", it becomes clear that in this case the loss suffered as a result of the negligent flagging by Moore, even assuming that he was the Railway's employee, was within the coverage of the policy.

■ This construction of the policy has commended itself to this court because:

"If the construction is doubtful, that which goes most strongly against the party executing the instrument, *or undertaking the obligation,* is generally to be preferred." (Emphasis supplied.) Ga.Code Ann. § 20–704, subd. 5.

Since this loss was covered by the policy, the Railway is entitled to recover the settlement amount and costs and reasonable attorney's fees incidental thereto. Unless counsel can agree upon a figure representing those attorney's fees, the court will hear evidence to establish the figure.

If the plaintiff still feels that there has been such bad faith on the part of the defendant as to entitle it to recover the figure representing 25% of the above recovery plus reasonable attorney's fees for prosecution of this action, evidence will be heard by the court in that regard.

Counsel for the Railway will prepare a judgment in accordance with the foregoing and submit same to opposing counsel who shall have 10 days in which to comment on form.