Sam Adams DORSEY and the Citizens and Southern National Bank, Executors of the Estate of Roby Robinson, deceased, Plaintiffs,

v.

STATE MUTUAL LIFE ASSURANCE COMPANY OF WORCESTER, MASS., Defendant.

Civ. A. No. 8173.

United States District Court
N. D. Georgia,
Atlanta Division.

Dec. 17, 1964.

**392**

Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., for defendant.

Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiffs.

MORGAN, District Judge.

Defendant State Mutual Life Assurance Co., of Worcester, Mass. (hereinafter called State Mutual) has filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure upon the grounds that there is no dispute as to any material fact in the case at hand. Thereafter, the plaintiffs, Sam Adams Dorsey and the Citizens and Southern National Bank, Executors to the estate of Roby Robinson, likewise filed a motion for summary judgment under Rule 56, the Federal Rules of Civil Procedure upon the same ground.

Both parties rely upon attached affidavits, the pleadings the pretrial order heretofore entered, and agreed admission of facts. The briefs having been submitted by both parties under local Rule 8 the case is now ripe for consideration. Both parties agree that there is no dispute as to any material facts.

The deceased, Roby Robinson, was killed while a passenger on a 707 Boeing Intercontinental Jet of Campagnie Nationale Air France (hereinafter referred to as "Air France") which crashed near Orly Field, Paris, France, on June 3, 1962. Deceased was a senior officer of the Robinson-Humphrey Co., a participating member of the National Association of Security Dealers, Inc. Insurance Trust, and State Mutual had issued a certificate of insurance under said policy, affording under certain circumstances accidental death insurance in the amount of $50,000.00 to Mr. Robinson. There is no issue concerning the form or due receipt by defendant of the proof of death.

The certificate of insurance contained the following exclusion which is the basis for the denial of liability by the defendant:

"No benefits shall be payable for any loss which is caused or contributed to by * * * being in or on or in contact with any kind of aircraft, either on the ground, water, or in the air, or falling or in any other manner descending with or from such aircraft, except loss resulting from

flight or travel as a passenger in a licensed aircraft (other than a chartered aircraft) operated by a licensed pilot on a scheduled passenger service regularly offered between specified airports by a passenger carrier duly licensed by the proper licensing authority * * *."

The question at issue narrows down to whether or not the accidental death of Roby Robinson was one excluded under the terms of the contract.

■■ The policy of insurance in this case is to be interpreted or construed, if the necessity for construction arises, according to the principles followed by Georgia Courts in the interpretation and construction of contracts. Sulzbacher v. Travelers Ins. Co., 8 Cir., 137 F.2d 386. Under Georgia Law State Mutual having admitted Robinson met his death by reason of the accident, the burden is on State Mutual to show that the loss comes within an exception to coverage. Johnson v. Southern Life Ins. Co., 95 Ga.App. 625; Jewelers Mutual Ins. Co. v. Balough (5th Cir.) 272 F.2d 889, 892.

■ Also, under Georgia Law where a contract of insurance is ambiguous or its meaning is doubtful, such contract is to be construed against the insurer and in favor of the insured. Georgia Southern & Florida Railway Co., 177 F.Supp. 751, 758, affirmed per curiam, 5 Cir., 272 F.2d 712. Exclusions from coverage are construed against the insurer and in favor of providing the indemnities sought. National Surety Co. v. Musgrove, et al., 5 Cir., 310 F.2d 256, 261.

The defense of State Mutual rests on provisions in the exclusion clause of the certificate. Is the accepted clause ambiguous? To determine this question, we must first examine the excepted clause in question. It is apparent under the clause that the insurer would not pay for loss being caused by contact with any kind of aircraft, even on the ground, water, or in the air, or falling or in any other manner descending with or from such aircraft, *except loss resulting from flight or*

*travel as a passenger in a licensed aircraft (other than a chartered aircraft) operated by a licensed pilot on a scheduled passenger service regularly offered between specified airports by a passenger carrier duly licensed by the proper licensing authority * * *.* (emphasis supplied).

Was the aircraft in the instant case a chartered aircraft as was intended in the contract of indemnity and was the aircraft on a flight between two points on Air France's schedule? It is now incumbent upon this Court to determine the contract of transportation between the insured, Robinson and Air France.

Air France is an international air carrier approved by the Civil Aeronautics Board. Air France operated on certain days each week between Houston and Paris via New York (Idlewild Airport) and on certain days between Paris, France and Houston, Texas, with a stop via New York. The insured Roby Robinson was a member of the Atlanta Art Association. It appears that around November, 1961, a committee of the Atlanta Art Association began negotiations with the American Express Co. to obtain a tour for the members of Atlanta Art Association. Thereafter, more than 100 members of the Association having made plans to make the trip, the officers of the Association entered into a contract (a charter flight agreement) with Air France for the tranportation of the various members of the Association, between Atlanta, Georgia and Paris, France via New York. The charter agreement will be hereafter dealt with in some detail.

Air France had no regularly approved scheduled flight into or out of Atlanta. Air France, however, did maintain an Atlanta office. The flight on which Robinson later met his death—arrived in Houston, Texas on May 8, 1962 from Paris. The flight was a Boeing 707 Jet, being Airplane F–BHSH. This same plane left Houston, Texas for Paris, France on Wednesday, May 9, 1962 as Flight AF0700. The extra digit was added to the flight number because the par-

ticular plane was to operate from Houston to New York and Paris, via Atlanta. Otherwise the flight would have been Air France Flight 070. No tickets were sold for Houston to Paris as the plane was pre-empted for use by the Atlanta group and the Jet was flown by way of Atlanta where it enplaned the Association members.

The return trip began on Sunday, June 3, 1962, and the return trip on which insured was killed is set forth by schedule A attached to the copy of the contract submitted with the application on May 17, 1962 for approval by the Civil Aeronautics Board of the return flight. This schedule provides that the return will be "Flight AF007". The evidence further shows that this disastrous flight was a regular Air France flight which leaves Paris at 13:00 on Sundays, Tuesdays and Thursdays of every week. Except for the disaster the Intercontinental Jet Aircraft No. F–BHSM would have proceeded on to Idlewild International Airport, New York and would have flown to Atlanta and from Atlanta to Houston, Texas to return to Paris on Monday, June 4th, as Flight AF 070.

Air France filed with the Civil Aeronautics Board its chartered tariff No. CH–1, in which it (Air France) offered to furnish charter transportation from New York to Paris, France, by a Boeing 707 for $4.29 per statute mile, plus ferry charges.

The letters of submission of Atlanta Art Association contracts to the CAB refer in one case to a ferry between New York and Atlanta, or Atlanta and New York and in the other to a ferry between Atlanta and Houston.

The regular tariff of Air France provides for the assessment of a ferry charge from the point of origin of the flight to the regular point of departure and for a ferry charge to return the aircraft to the point required by the carrier.

In this case, the compensation to be paid by the members of the Atlanta Art Association included a ferry charge as fixed by the tariff ($3.15 per statute mile) from Atlanta to New York where the plane returned to the regular route, and on the return trip a ferry charge at the same rate from Atlanta to Houston where the plane would return to the regular route.

It does not appear that the ferry charge is of import here for the reason that the accident occurred as the plane was taking off at Orly Field for New York, both points being points between which Air France operated these flights every day.

■ Defendant insists that the exclusion clause prevents a recovery for the reason that aircraft in the instant case was a chartered plane. It is true that the original contract between the Art Association and Air France which was approved by CAB refers to the flight as "International Charter Flight Agreement," yet it might be noted that the word "charter" is used to describe many and varied transportation arrangements. Questions of charter-parties have arisen mainly in connection with maritime matters. A "charter-party" is ordinarily the contract between two parties having to do with the use and operation of a sea-going vessel.

Justice Field, speaking for the Supreme Court in the case of Leary v. United States, 14 Wall. 607, 20 L.Ed. 756 held:

"The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case, the

charter-party is a contract for the lease of the vessel; in the other, it is a contract for a special service to be rendered by the owner of the vessel."

Also, in the case of United States v. Hvoslef, 237 U.S. 1, 16, 35 S.Ct. 459, 59 L.Ed. 813, 820. Mr. Justice Hughes speaking for the Court said:

"A charter party may be a contract for the lease of the vessel, or for a special service to be rendered by the owner of the vessel. Where, as is very frequently the case, the ship-owner undertakes to carry a cargo, to be provided by the charterer, on a designated voyage, the arrangement is, in contemplation of law, a mere contract of affreightment. By such a charter, the shipowner is the carrier of the goods transported by the ship, 'for the reason that the charter party is a mere covenant for the conveyance of the merchandise or the performance of the stipulated service.' Marcardier v. Chesapeake Ins. Co., 8 Cranch, 39, 49, 50, 3 L.Ed. 481, 484; Reed v. United States, 11 Wall. 591, 600, 601, 20 L. Ed. 220; Leary v. United States, 14 Wall. 607, 610, 20 L.Ed. 756; Richardson v. Winsor, 3 Cliff. 395, 399, Fed.Cas.No.11,795; The T. A. Goddard, 12 Fed. 174, 178; 1 Parsons, Shipping, p. 278."

Another case which this Court feels is pertinent to the issues involved is the case of Alaska Air Transport, Inc. v. Alaska Airplane Charter Co., 11 Alaska 372, 72 F.Supp. 609, 610. In this case, the question at issue is whether the involved air carrier was a common carrier or a mere lessor of private planes. The Court said:

"Defendant contends that it is not a common carrier because it does not operate on a schedule and engages in charter service exclusively. By its initial announcement and subsequent advertising it held itself out as operating a charter service. It is significant, however, that the term 'charter' is not used in this connection in a strictly legal sense to indicate instances where control of the plane is surrendered by the owner to the charterer or lessee. Rather the term is used to describe those cases in which the exclusive use of the plane is contracted for usually at an hourly rate, which is the normal procedure where air transportation is desired for pleasure, sightseeing, hunting, fishing, or other purposes. But it does not necessarily follow that such operations have the effect of removing one from the status of a common carrier in the absence of a change in the control of the plane. Cf. United States v. Hvoslef, 237 U.S. 1, 35 S.Ct. 459, 59 L.Ed. 813, Ann.Cas.1916A, 286; Curtiss-Wright Flying Service, Inc. v. Glose, D.C.1932, affirmed, 3 Cir., 66 F.2d 710, certiorari denied 290 U.S. 696, 54 S.Ct. 132, 78 L.Ed. 599. In all such cases the contractual arrangement is for the furnishing of transportation, and the owner does not lose his status as a carrier. Terminal Taxicab Co. v. Kutz, 241 U.S. 252, 36 S.Ct. 583, 60 L.Ed. 984, Ann.Cas.1916D, 765; State ex rel. Anderson v. Witthaus, 340 Mo. 1004, 102 S.W.2d 99."

Now it becomes necessary for the Court to consider the International Charter Flight Agreement executed between officers of the Atlanta Art Association and Air France. Just what was the relationship of Robinson and Air France? Set out below are some of the provisions from the International Fight Agreement (contract) which appear to the Court to be pertinent and significant. The provisions of such contract provided as follows:

1. The Atlanta Art Association should purchase from Air France and Air France should furnish to charterer "charter air transportation" as described in the schedule and that "all transportation hereunder shall be subject to all conditions of carriage, rules and regulations of Air France. Charterer shall observe such conditions of carriage, rules

and regulations and obey all instructions of Air France's agents and employees."

2. That the expenses for fuel, oil, crew salary and crew expense and landing fees for the aircraft should be for the account of Air France.

3. That Air France should have exclusive control over the aircraft and reserve the right, in its sole discretion, to determine the route to be flown and airports to be used.

4. That the Captain of the aircraft should have complete discretion concerning the load carried and its distribution as well as the manner in stowing and discharging.

5. That the operating personnel are the servants of Air France and should remain at all times under the exclusive control of Air France.

6. That no passenger should be carried unless the passenger had a ticket from Air France and that no baggage would be carried unless Air France had issued a baggage check therefor.

7. That Air France, the charterer, and all passengers and shippers would be bound by the terms and conditions of Air France tickets, baggage tickets and airway bills.

8. That with respect to the flight to Paris and with respect to the flight from Paris, the aircraft should be a Boeing 707 Intercontinental Jet. No particular aircraft was listed.

Each letter of application for approval of the CAB, that is, one for the flight to Paris and the other for the flight from Paris stated that it "hereby requests * * * permission to operate * * * a charter flight * * *."

■■ The contention of the defendant that there can be no recovery here because the aircraft was a chartered aircraft under the arrangement between the Atlanta Art Association and Air France is without merit.

This was not a chartered aircraft. The contract provided for charter transportation. It was a charter flight in the sense that the aircraft carried as passengers only the persons to whom tickets had been issued pursuant to the arrangement by the Atlanta Art Association. However, Air France did reserve the right to use available space not required by the charter for its own personnel and cargo. Measured by the rules stated by Justice Hughes in the case of United States v. Hvoslef, supra, the arrangement between Atlanta Art Association and Air France evidenced by the contract, was a mere "contract of affreightment." In order for the aircraft to be a "chartered aircraft" within the meaning of the ordinary signification of those words, it had to be a rented or hired airplane placed in the custody and control of the charterer by a contract related to a particular airplane.

Charter arrangements and agreements vary substantially with each situation. In the particular arrangement here involved, the Atlanta Art Association was actually no more than a travel agent for its members to secure group rate transportation and once the rate was secured, each member paid Air France for his or her ticket, and a direct contractual relationship arose between each member passenger and Air France. At that time the ticket then became the "contract of carriage" between the holder and Air France. The tickets in this case were delivered three weeks before May 9, 1962, the day of departure. On the day of departure, each ticket holder member held a reservation and ticket on an Air France flight from Atlanta to Paris, known as Flight No. AF 0700 approved by the Civil Aeronautics Board.

For the reason stated above, the aircraft here involved was not a chartered aircraft and it remains only to determine whether or not the other exclusion provisions upon which defendant relies relieves State Mutual of liability in this case.

The other language of the exclusion is that no benefits will be payable on account of any loss which is caused or contributed to by being in or on or in contact with any kind of aircraft, or falling or in any manner descending in or from such aircraft, "except loss resulting from

flight or travel (1) as a passenger, (2) in a licensed aircraft, (3) operated by licensed pilot, (4) on a scheduled passenger service, (5) regularly offered, (6) between specified airports, (7) by a passenger carrier duly licensed by the proper licensing authority."

Exceptions numbers 1, 2, 3, 6 and 7 are not disputed. Mr. Robinson was a passenger. He held a ticket. He was not in charge of the airplane and had paid his fare. The Boeing 707 Intercontinental Jet was licensed. The Jet was operated by Roland Hoche, a licensed pilot with more than 14,000 total flying hours. The co-pilot was Jacqus Pitoiset, a licensed pilot with more than 7,000 hours. The Jet was operated by a passenger carrier duly licensed by the proper licensing authority. Before take off the pilot had filed a flight plan. The flight was between the specified airports of Orly Field near Paris and Idlewild International Airport in New York.[1]

The second contention asserted by the defendant is that the flight was not a "scheduled passenger service within the meaning of this phrase as used in the exclusion policy."

 A scheduled passenger service, giving the ordinary meaning to the words, means a passenger service scheduled, that is, "appointed or designated to be performed at a fixed time in the future." The contract between the Art Association and Air France and the tickets issued to each individual member constituted a schedule because by the contract Air France agreed to perform the service of carriage, that is, conveying the passengers to Paris and conveying them from Paris back to New York at a fixed time in the future. When the tickets embodying the same obligation and issued to each individual passenger are considered along with the International Flight Agreement, it becomes perfectly clear that this was "a scheduled passenger service."

The late Judge Robert Russell had a similar question in the case of Little v. Globe Indemnity Co. decided June 29, 1949, being C.A. No. 3296, District Court, Northern District of Georgia, reported in 1949 USAVR 353. In that case, the policy sued on covered the insured while he was a passenger in, "aboard or alighting from an aircraft owned and operated by a common carrier for passenger service on a *scheduled trip* over an established passenger route of such carrier within the bounds of * * * the United States". (Emphasis supplied.)

At the time, Delta Air Lines had no established route for passenger service from Macon to Columbus. Little was District Traffic Manager of Delta Air Lines who, along with other officials of Delta was a passenger on a flight from Macon to Columbus when the crash occurred. Both Macon and Columbus were points on a route which had been awarded to Delta by the Civil Aeronautics Authority a short time prior to the accident, and at the time of the accident, Mr. Little was on the aircraft in which the officials were traveling to Columbus to make arrangements to initiate flights out of Columbus. The flight of the Delta officials to Columbus had been planned in advance to make such arrangements.

In holding that the complainant was entitled to recover, Judge Russell held:

"At the time of the death of the insured the Delta Air Lines had no established route for passenger service from Macon, Georgia, to Columbus, Georgia. Both Macon, Georgia, and Columbus, Georgia, were points on a route which had been awarded to Delta Air Lines by the Civil Aeronautics Authority a short time prior to the accident."

"Applying to the language of the contract its reasonable meaning, the full coverage provided by the language in the vital insuring clause is fairly susceptible of an interpreta-

---

1. Orly Field is operated by a governmental agency of France and Idlewild International Airport is operated by the Port Authority of the City of New York. Both airports are regularly used by Air France for its flights.

tion, which, under the particular facts of this case, will afford coverage. On the other hand, under a strict and technical construction, the accident in question would not come within the terms of the policy. Under the first interpretation, the insured was accidentally killed while a passenger in an aircraft owned and operated by a common carrier for passenger service, on a scheduled trip, over an established passenger route of such carrier, and thus the facts measure up to the language and establish liability. The policy is likewise subject to the construction urged by the insurer that the flight in question must have been a common carrier operation on regular schedule of file with the Civil Aeronautics Authority, over a route over which passenger service is regularly maintained. Applying the well established rule of liberal construction in favor of the insured, and strictly as against the insurer, it follows that the occurrence in question, under the circumstances, should be held to be within the coverage of the policy. It would seem that no other result can properly follow when, as to each provision of coverage, it is satisfactorily demonstrated by the complainant beneficiary that the facts existing come within the terms of the insuring clause. Thus, to make specific application, the insured at the time of his death was a pasenger, not a pilot, in an aircraft owned and operated by the Delta Air Lines, which is a common carrier, for passenger service, and not cargo service, on a trip which had been planned in advance or scheduled, and was over a passenger route which had been established by grant from the Civil Aeronautics Authority."

Under the facts of the case at hand, we are not concerned with the flight from Atlanta to Paris. Neither are we concerned with the projective flight between New York and Atlanta on the return trip. Mr. Robinson was killed in the crash of a Boeing 707 Jet Aircraft bearing registration F–BHSM on its take-off from Orly Field as "Flight AF007." Flight AF007 was a scheduled passenger service. It was scheduled on the time tables published by Air France. It was regularly offered by the publication on the time tables.

The flight on which Mr. Robinson met his death was clearly "a scheduled passenger service" regularly offered. The fact that the flight has been pre-empted by the sale of all the seats under previous arrangement did not prevent it from being a "scheduled passenger service" regularly offered.

In addition to the face value of the policy, plaintiff is seeking to recover in addition to the face amount of said policy, 25% as damages plus reasonable attorneys fees for the prosecution of this action as authorized and provided in Section 56–1206 of the Code of Georgia.

 In Georgia, the refusal of an insurance company "in bad faith" to pay means a frivolous and unfounded denial of liability. If there is any reasonable ground for contesting the claim there is no bad faith. Pearl Assurance Co. v. Nichols, 73 Ga.App. 452, 455, 37 S.E.2d 227.

 Whether there is any reasonable grounds for contesting the claim is a matter which depends upon the circumstances existing when liability is declined, or not admitted, not by the event of the ultimate determination. Hanover Fire Ins. Co. of New York v. Argo, 5th Cir., 251 F.2d 80, 83.

 Under the admitted facts in the case at hand, the issues in this case are novel. Some of the questions involved in this case are for the first time adjudicated. From the state of facts considered by the Court in this case, it cannot be said that such questions are easy of solution. Under these circumstances, this Court cannot say that a resort to the Courts by the defendant to have these questions determined was unreasonable.

The defendant should not be charged with penalties and attorneys fees under the state of facts in this action. See Georgia Casualty & Surety Co. v. Seaboard Surety Co., D.C., 210 F.Supp. 644, 5 Cir., 327 F.2d 666.

As a question of fact or of law, the plaintiff should not recover penalties and attorneys fees as provided in Section 56–1206, of the Georgia Code Ann.

For the reasons stated above, plaintiffs' motion for summary judgment is granted as to the face value of the policy and the defendant's motion for summary judgment is denied.

This opinion shall constitute the findings of fact and conclusion of the law in accordance with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Let judgment be entered accordingly.