**Catherine C. JORDAN, Catherine Jordan Beal, and Robert A. Jordan, Plaintiffs,**

v.

**Paul W. SMITH, et al., Defendants.**

**Civ. A. No. C82–2312A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 5, 1984.

Michael Mears, McCurdy & Candler, Frank J. Rhoads, Jr., Weekes, Candler, Sams, Weatherly & Shinall, P.C., Decatur, Ga., for plaintiffs.

Harry L. Cashin, Jr., James D. Spratt, William T. McKenzie, L. Joseph Loveland, Michael C. Russ, King & Spalding, Barry S. Mittenthal, Meade Burns, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This case is presently pending before the court on four motions for summary judgment, three of which were filed by defendants. The complaint alleges violations of the Securities Exchange Act of 1934, and several pendent state claims set out below. Oral argument was heard on all motions for summary judgment on March 2, 1984, and the case is now ripe for ruling on those motions.

### A. THE FACTS.

The operative facts that are not in dispute are as follows. Paul W. Smith and William N. Jordan were the founders and co-owners of Southern Oxygen Supply Company (SOSCO), with each individual owning 50% of the stock at the time of the corporation's formation in 1950. On May 31, 1971, Jordan and Smith entered into an agreement that provided for the redemption by SOSCO of Jordan's stock interest. This agreement is reproduced in full below:

"1. William M. Jordan does hereby agree to sell to the Company and the Company does hereby agree to purchase from William M. Jordan the common stock of the Company now owned by Jordan to be purchased by the Company at the rate of Twenty-Five Thousand ($25,000.00) Dollars annually, payable in equal monthly installments beginning June 1, 1971, and on the first day of each succeeding month through May 1, 1991.

"As security for the performance by the Company of its obligations hereunder, Jordan shall and does retain a security interest in all the shares of the common stock presently owned and held by him until the obligations of this agreement have been satisfied by the Company.

"2. Each of the parties to this agreement does hereby acknowledge and recognize this contract to be fully binding upon the Company and each of the several parties hereto and upon any subsequent stockholders hereafter requiring any of the common stock of the corporation or any preferred stock which may be hereafter issued; and it is expressly agreed by the parties hereto that the certificates of stock now outstanding and hereafter sold and issued to any parties shall bear in the margin thereof the following legend: 'The stock ownership evidenced by this certifi-

cate is made expressly subject to the obligations of a certain agreement between Southern Oxygen Supply Company, Paul W. Smith and William M. Jordan, dated May 31, 1971.'

"3. It is agreed by the parties that the 'Key Man' insurance presently owned by the Company now in effect upon the life of William M. Jordan shall be forthwith transferred to Jordan so that hereafter he shall be the owner of such insurance, with all rights therein, including the designation of beneficiary, and Jordan shall pay to the Company such sum as shall be agreed upon between the parties hereto as adequate consideration for the conveyance and transfer of such insurance to him by the Company.

"4. It is likewise agreed by the parties hereto that the automobile presently owned by the Company and in the possession of Jordan shall be purchased by him and title transferred to him by the Company's officers upon payment by Jordan of such consideration as shall be agreed to by the parties.

"5. It is further agreed by the parties hereto that William M. Jordan will be and is hereby employed as a Consultant to the Company and its Board of Directors, effective June 1, 1971, at an annual salary of Ten Thousand ($10,000.00) Dollars, payable semi-monthly for a period of three (3) years, or until the full benefits of the Company's retirement program shall have become payable to him at the attainment by Jordan of the age of sixty-five (65) years.

"The terms and conditions and duties of the employment as Consultant shall be those hereafter agreed to between Jordan and the President of the Company.

"6. It is expressly agreed between the parties hereto that William M. Jordan, during the tenure of his employment as Consultant to the Company and so long as he shall be eligible in any capacity for coverage under the contract providing the medical and disability benefits now in effect will continue to be covered by the medical and disability benefits now in effect and hereafter made effective as to employees of the Company and upon the same terms and conditions as applicable and effective as to him prior to June 1, 1971.

"7. Effective June 1, 1971, Paul W. Smith does hereby agree, together with the Company, to obtain and keep in full force and effect a certain contract or policy of insurance upon the life of Paul W. Smith, with benefits in the face amount of not less than Five Hundred Thousand ($500,000.00) Dollars payable to the Company, the benefits of such policy to be utilized by the Company as earned surplus for the purpose of paying to Jordan in the event of the death of Smith such balance as shall be due Jordan upon the purchase price of Jordan's common stock, as contemplated by this agreement.

"The Company covenants and agrees that it will pay all premiums as the same become due upon said policy and that it will not encumber such policy to any extent which will reduce the benefits payable thereunder to an amount less than the amount remaining due and outstanding upon the purchase price of the Jordan stock as herein contemplated.

"It is further covenanted and agreed by the Company and Paul W. Smith that in the event of the death of Paul W. Smith and the receipt by the Company of the benefits payable under the aforesaid policy of insurance, the full amount then remaining due and outstanding to Jordan will be paid forthwith in full in a liquidation of its obligation under this agreement to purchase said Jordan stock, that is to say, the remaining installments shall be accelerated and due and payable at once.

"8. Subject only to the rights of the creditors of the corporation, other than stockholders, Paul W. Smith, individually, for himself, his heirs, administrators and executors, does hereby waive all statutory limitation provisions relating to surplus and reserves of capital and earnings for the purpose of the performance by the corporation of its obligations under this agreement and does, in this connection, agree and waive any objection to the application of

earned surplus and/or capital surplus to the liquidation of the corporation's obligations under this agreement, irrespective of whether such application affects a reduction of the capital surplus, either reserved or unreserved, except that no such distribution or application of corporate assets may be made when such application would render the corporation insolvent to the detriment of its general creditors.

"9. William M. Jordan shall have the privilege, at his option, to re-purchase from the Company his capital stock which may have been paid for by the corporation pursuant to this agreement, upon the occurrence of the total disability of Paul W. Smith or at any other time, by paying without interest to the corporation the amount having previously been paid by the Company to Jordan pursuant to Paragraph 1 of this agreement. In the exercise of this privilege, however, William M. Jordan shall not acquire more shares of the Stock of the Company than are then standing in the name of Paul W. Smith.

"10. This agreement supersedes and is fully intended to extinguish all prior agreements made and entered into by and between these same parties relating to the retirement or re-purchase of any of the stock of the corporation.

"11. Each of the parties hereto does acknowledge, covenant and agree that the provisions of this agreement are binding upon and that the benefits hereunder shall inure to the heirs, assigns, administrators and executors of the individual parties hereto and to the successors and assigns of the corporate party hereto and that this writing constitutes the complete agreement by the parties relating to the subject matters herein dealt with and that, except as otherwise expressly stated, all prior oral discussions, negotiations and agreements are embodied herein and are extinguished hereby as relate to the subject matters embraced within this agreement."

On their 1971 federal income tax return, Jordan and his wife treated the sale of the stock under the agreement as a complete redemption of Jordan's stock interest in SOSCO. Following his retirement, Jordan transferred his interest in certain of the shares in SOSCO to plaintiffs Catherine Jordan Beal and Robert A. Jordan; as of December 22, 1975, pursuant to these transfers, plaintiffs Catherine Jordan Beal and Robert A. Jordan each held 1,536 shares of SOSCO stock.

On June 21, 1978, Jordan died. Pursuant to the terms of his last will and testament, plaintiff Catherine C. Jordan inherited his interest in the 11,136 shares of SOSCO stock held at his death. For federal estate tax purposes, the shares were valued at the price set by the 1971 agreement; no value was ascribed to the re-purchase option set forth in paragraph nine of the 1971 agreement.

On September 30, 1980, Paul W. Smith sold 2,140 shares of SOSCO stock to defendant Lester Nelson; Nelson at that time was the vice president of SOSCO. Also on that same date, Paul W. Smith made gifts to members of his family with each member obtaining 1,070 shares. All of the recipients of this stock are named defendants to this lawsuit.

On January 19, 1981, SOSCO paid plaintiffs Catherine C. Jordan, Robert A. Jordan, and Catherine J. Beal the sums of $223,050.82, $23,903.31, and $11,379.19, respectively, these amounts constituting the total of all payments remaining under the terms of the 1971 agreement. Upon receipt of these funds, plaintiffs released their security interest in the shares and surrendered the stock certificates to SOSCO.

Subsequent to discussions between Paul W. Smith, as president of SOSCO, and Mr. Walter Hoek, the authorized corporate representative of defendant N.V.W.A. Hoek's Machine-En Zuurstoffabriek (hereinafter referred to as "Dutch Corporation"), a stock purchase agreement was entered into between the Dutch Corporation and the shareholders of SOSCO on May 28, 1981; on that date, the closing of the sale of SOSCO to the Dutch Corporation occurred. In connection with the closing, all of the shares of SOSCO's shareholders (with the

exception of defendant Lester Nelson) were sold or tendered to representatives of the Dutch Corporation. According to the complaint, SOSCO was sold to the Dutch Corporation for a sum in excess of $5.8 million.

Plaintiffs were aware of the acquisition of SOSCO by the Dutch Corporation by no later than June of 1981. In October of 1981, in correspondence with the District Director of the Internal Revenue Service regarding Catherine C. Jordan's income tax for prior years, Mrs. Jordan's authorized representative took the position that the re-purchase option of paragraph nine was personal to Jordan and did not extend to the plaintiffs.

"Upon discovery of the sale of the defendant SOSCO to the defendant Dutch Corporation or its wholly owned subsidiary, ... the plaintiffs, through counsel, made demand upon the defendant SOSCO pursuant to the terms of the Redemption Agreement to reacquire 21,400 shares representing one-half of the outstanding shares in the defendant SOSCO." Complaint, ¶ 20. The demand letter is dated March 30, 1982, and was refused by defendants.

Plaintiffs' complaint is cast in eight counts. Count I asks this court to determine whether plaintiffs have the right to reacquire one-half of the stock in SOSCO upon tender of $500,000. This count is brought pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. 57, in that plaintiffs seek a declaratory judgment as to the rights of the parties with regard to the redemption agreement. Count II alleges breach of contract. Plaintiffs contend that defendants SOSCO and Paul W. Smith breached the redemption agreement by reason of their failure to issue plaintiffs 21,400 shares of SOSCO stock, or the stock formerly owned by William N. Jordan. Count III alleges a violation of Section 10(b) and Rule 10b–5. In the prayer to this count, plaintiffs seek general damages against defendants Nelson, Paul W. Smith, and SOSCO, jointly and severally, in the amount of $2.4 million, or to void the acquisition of SOSCO by the defendant Dutch Corporation. Count IV alleges a violation of 15

U.S.C. § 78t as against defendants Nelson and Paul W. Smith. This count contends that liability exists as to these defendants, inasmuch as they were "controlling persons" of SOSCO within the meaning of the Securities Exchange Act of 1934. Plaintiffs seek general and punitive damages under this count as against Paul W. Smith and Nelson, as well as attorney's fees and costs. Count V alleges a breach of fiduciary duty under Georgia law. Plaintiffs contend that defendants Nelson and Paul W. Smith failed to disclose to plaintiffs the pending terms and conditions of the acquisition of SOSCO. Count VI alleges fraud as against Paul W. Smith. Count VII alleges a conspiracy to defraud against all the defendants. This count presumably is grounded under Georgia law. Count VIII alleges that the damages sought in Counts II through VII are liquidated, and plaintiffs thereby seek interest from January 5, 1981. (In their complaint, plaintiffs contend that on January 5, 1981, SOSCO determined that it would acquire all of plaintiffs' remaining stock through payment of $260,-000 for the 11,681 shares then owned by the plaintiffs.)

## B. THE CONSTRUCTION OF THE CONTRACT.

The threshold issue raised by the parties' motions for summary judgment in this case is whether the plaintiffs acquired, pursuant to the May 31, 1971 agreement, a right to repurchase the shares of stock that had been redeemed by the company. The defendants argue that if the plaintiffs did not acquire such a right, the defendants are entitled to summary judgment as to all counts of the complaint. Plaintiffs' argument supports this conclusion, as the harm which plaintiffs allege in counts two through eight of the complaint is that because they were not informed of the impending purchase of the company, they could not intelligently exercise their right to repurchase. If plaintiffs had no right to repurchase the stock, then the May 31, 1971 agreement required them to sell their shares in the company to the company at the price named in the contract.

The first goal of contract construction is to "find and give effect to the true intent of the contracting parties." *Southern Federal Savings and Loan Association v. Lyle,* 249 Ga. 284, 287, 290 S.E.2d 455 (1982), citing *Carsello v. Touchton,* 231 Ga. 878, 204 S.E.2d 589 (1974); *see also* O.C.G.A. § 13–2–3. If the terms of the contract are clear and unambiguous, it is to the contract alone the court must look to find the parties' intent.[1] *Southern Federal, supra,* 249 Ga. at 287, 290 S.E.2d 455, citing *DeLong v. Cobb,* 215 Ga. 500, 111 S.E.2d 89 (1959). In looking to the language of this contract, the court must determine whether it was the intention of the parties to it, Smith and Jordan, that paragraph 11, which provides that the "benefits" of the contract inure to the heirs and assigns of the parties, would entitle the plaintiffs, as heirs and assigns of William M. Jordan, to exercise the "privilege" of repurchase given to Mr. Jordan in paragraph 9 of the agreement. The plaintiffs have argued that the language of the contract is clear and unambiguous, establishing that they are entitled to stand in the shoes of Mr. Jordan, and to exercise the repurchase privilege. The defendants, however, have pointed out that paragraph 9 of the agreement, providing for repurchase, refers to that option as a "privilege," while paragraph 11, which plaintiffs allege gives them the right to invoke the repurchase privilege, refers to "benefits" inuring to heirs and assigns of the parties to the agreement.

Merely because the plaintiffs and defendants differ as to the meaning of the terms of this contract does not create an ambiguity.[2] "... [A] contract is not ambiguous, even though difficult to construe, unless and until an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties." *Webster v. Star Distributing Co.,* 241 Ga. 270, 273, 244 S.E.2d 826 (1978).

In looking solely to the contract to find the parties' intent, the court is guided by two standards of construction: first, the meaning of words in this particular contract; and second, the common meaning of the words. A review of the contract language under either of these two standards reveals that the plaintiffs are not entitled to assert the paragraph 9 repurchase privilege. Any rights which the plaintiffs have under this contract must evolve from paragraph 11, which provides in pertinent part that "... the benefits hereunder shall inure to the heirs, assigns, administrators and executors of the individual parties hereto ...." Therefore, unless the repurchase privilege is considered a "benefit" under the contract, paragraph 11 confers no rights on the plaintiffs in that respect.

The court concludes that upon review of the contract as a whole, the clear meaning of the contract is that the provisions of paragraph 9 are not a "benefit" as that term is used in this contract. The term "benefits" appears several times in the contract. It first appears in paragraph 5, which provides that Jordan's employment as a consultant with the company will end when "... the full benefits of the company's retirement program shall have become payable to him." Paragraph 6 provides that during Jordan's tenure as a consultant, he shall be covered by the "medical and disability benefits" then in effect. Paragraph 7, which provides for insuring the life of Paul Smith as the "key man" of the corporation, refers to "... the benefits of such [insurance] policy to be utilized by the company ... for the purpose of paying Jordan ...." The same paragraph notes that the company agrees not to encumber the insurance policy such that it will "reduce the benefits payable thereunder." Fi-

---

1. The construction of a contract is a question for the court. O.C.G.A. § 13–2–1.

2. The duty of the court to construe a contract applies only where the contract is free of ambiguity. *Whitney v. Hagen,* 65 Ga.App. 849, 16 S.E.2d 779 (1941). An ambiguity remaining in a contract after construction by the court raises a jury question. O.C.G.A. § 13–2–1; *Warrior Constructors v. E.C. Ernst Company,* 127 Ga.App. 839, 195 S.E.2d 261 (1973).

nally, paragraph 7 also refers to the receipt by the company of the "benefits payable" on the policy. It is abundantly clear that as these parties used the term "benefits," they were referring to monetary payments. Such a construction is consistent with the document as a whole, since Jordan's heirs and assignees would certainly be entitled to demand the continued insurance on the life of Paul W. Smith so that the installment payments on the sale of Jordan's shares of stock would be guaranteed.

█ The same word in a written instrument ". . . occurring more than once is to be given the same meaning unless the context indicates that a different meaning was intended." *Tudor v. American Employers Insurance Corporation,* 121 Ga.App. 240, 244, 173 S.E.2d 403 (1970); *see also Runyan v. Economics Laboratory, Inc.,* 147 Ga.App. 53, 248 S.E.2d 44 (1978); *Tennessee Corp. v. Hartford Accident and Indemnity Co.,* 463 F.2d 548, 551 (5th Cir. 1972) (applying Georgia law) (cited proposition is "firmly established"). The court therefore concludes that the word "benefits," when used again in paragraph 11, had the same meaning as it carried in the remainder of the document, i.e., payments. This construction is consistent with the parties' use of the word "privileges" in paragraph 9, since "privileges" must have a meaning which is separate and distinct from "benefits," or the parties would have used the word "benefits" again. ". . . [E]very word of the contract must be given a meaning if possible for the reason that the parties must have intended a meaning to be attached to each word." *Georgia, Southern and Florida Railway Company v. United States Casualty Company,* 177 F.Supp. 751, 757 (M.D.Ga.1959) (applying Georgia law), *aff'd,* 272 F.2d 712 (5th Cir. 1960). *See also Willingham v. Life & Casualty Insurance Co.,* 216 F.2d 226 (5th Cir.1954).

The second canon of language construction requires words to be ". . . taken and understood in [their] . . . plain, ordinary, and popular sense . . . Dictionaries supply the plain, ordinary, and popular sense."

*Henderson v. Henderson,* 152 Ga.App. 846, 847, 264 S.E.2d 299 (1979) (citations omitted). Turning to dictionary definitions of the terms involved in the contract now before the court, the court finds yet another reason why the plaintiffs in this case were not intended to be able to implement the provisions of paragraph 9. According to the Random House American College Dictionary (1970), the terms "benefit" and "privilege" are defined as follows:

> Benefit: 1. Act of kindness. 2. Anything that is for the good of a person or thing. ... 4. A payment or other assistance given by an insurance company, mutual benefit society, or public agency. 5. To do good to; be of service to. 6. To gain advantage; make improvement. Privilege: 1. A right or immunity enjoyed by a person or persons beyond the common advantages of others. 2. A special right or immunity granted to persons in authority or office; a prerogative. 3. A prerogative, advantage, or opportunity enjoyed by anyone in a favored position (as distinct from a right). 4. A grant to an individual, a corporation, etc., of a special right or immunity, sometimes in derogation of the common right. 5. The principle or condition of enjoying special rights or immunities....

The court finds that these common, everyday, dictionary definitions demonstrate that the intention of the parties in using the word "benefit" in some situations and the word "privilege" in others was that the privilege conferred in paragraph 9 did not pass with the benefits under paragraph 11. The definition of the word "privilege" is particularly interesting. The dictionary defines it as "a prerogative, advantage, or opportunity enjoyed by anyone in a favored position." This clearly applies in the present situation to the position of William M. Jordan. The undisputed facts are that he was retiring from a company he had co-founded and run for nearly 20 years. In light of that, the parties agreed to confer upon him the prerogative to become re-associated with the company if it became necessary. This is particularly borne out

by the last provision of paragraph 9, which states that William Jordan cannot repurchase more shares than Paul Smith was holding at the time demand was made. In view of the fact that the two men had been co-owners of the corporation, each holding 50%, it is reasonable to infer that they intended that if William Jordan became reinvolved with the corporation he would not be able to take more control than Paul Smith had.

■ Therefore, the court concludes that after applying the rules of construction, no ambiguity remains in this contract. The word "benefits" in paragraph 11 did not confer on plaintiffs the "privilege" of repurchase in paragraph 9. Defendants' motions for summary judgment on this point are GRANTED.

Even if the court concludes that the use of the differing terms "privileges" and "benefits" creates an ambiguity in the contract, defendants are entitled to summary judgment. As the Georgia Court of Appeals has noted, "ambiguity in a contract may be defined as a duplicity, indistinctness, an uncertainty of meaning or expression." *Travelers Indemnity Company v. A.M. Pullen and Company*, 161 Ga.App. 784, 789, 289 S.E.2d 792 (1982). The use of the differing terms "privileges" and "benefits" in the contract at issue, and the differing interpretations urged by the parties of those terms, may indicate that there is an uncertainty of meaning present in this contract, even after application of the foregoing rules of construction. If an ambiguity remains, the court may look to all surrounding circumstances to determine the parties' intent. *Southern Federal*, 249 Ga. at 287, 290 S.E.2d 455.

In considering the circumstances surrounding the execution of this contract to arrive at the parties' intent, the court is free to look to extrinsic evidence. The Georgia Parol Evidence Rule, O.C.G.A. § 24–6–1, precludes admission of parol evidence to contradict or vary the terms of a valid written instrument. However, O.C.

G.A. § 13–2–2(1), in the contracts title, allows parol evidence to be admitted to prove "all the attendant and surrounding circumstances" of a contract. *See also* 3 Corbin on Contracts, § 554, noting that extrinsic evidence may make an ambiguity as to meaning so clear that no question of fact exists.

Under the facts of the present case, at the time this contract was entered into, the two individual parties, Smith and Jordan, had been the sole shareholders in a closely-held corporation for the previous 20 years. Jordan at the time was 62 years old, and the agreement was entered into for purposes of enabling him to retire. However, as the plain language of paragraph 9 reflects, the parties had contemplated the situation in which the buy-out agreement of paragraph 1 could be nullified; i.e., the "total disability of Paul W. Smith" would jeopardize the payments to Jordan, in view of the closely-held nature of the corporation. The defendants have argued, with the support of the affidavit of Paul Smith, that paragraph 9 contemplated the situation in which Jordan might have to come back to work for the company. In such an event, the defendant argues, paragraph 9 was intended to provide a mechanism by which Jordan could repurchase his shares, to the extent of those then owned by Paul Smith, and resume active involvement with the company to protect his financial stake therein. Therefore, the defendants argue, the repurchase provision was personal to William Jordan. The court has considered this affidavit, and notes that it is consistent with the position taken by the plaintiffs before the Internal Revenue Service.[3] In support of their contention that the repurchase option had no value for estate valuation purposes because it was personal to Jordan, plaintiffs argued that

> It is inconceivable that Paul Smith would have agreed to any provision that would have made possible a reacquisition by a selling shareholder that would have allowed such shareholder to share equally

---

3. The court is not finding plaintiffs to be "judicially estopped" by this letter. Rather, the letter is merely additional evidence of the parties' intent in making the contract.

in the accumulated profits and good will of a corporation earned over a period of twenty years or longer. It is inconceivable that a court would so interpret this provision.

In view of the parties' circumstances at the time of entering into the contract, the court concludes that there are only two possible interpretations of paragraph 9 as it interrelates with paragraph 11. The first interpretation holds that the use of the term "privileges" in paragraph 9, and the term "benefits" in paragraph 11, indicates that the parties did not contemplate that the benefits conferred by paragraph 11 included the privilege named in paragraph 9. The second possible interpretation, that urged by plaintiffs, is that paragraph 11 conferred upon anyone, to whom William Jordan transferred shares of stock in the company and the right to receive payments under paragraph 1, the right to buy back into this closely-held corporation, the same number of shares then owned by Paul Smith, thus potentially entitling the assignee to own up to 50% of the shares in the company. The court concludes that plaintiffs' interpretation of the interrelationship of these two contract provisions is unreasonable.

█ In view of the fact that the company had been closely held for nearly 20 years, and given that the agreement of May 31, 1971 contemplated the company's repurchase of William Jordan's shares, the court finds that in light of the circumstances surrounding the making of the contract, plaintiffs' proposed interpretation is unreasonable. As defendants point out, plaintiffs' interpretation would mean that anyone, even a stranger, to whom Jordan assigned shares of stock, had the potential for becoming a 50% shareholder in the company. As the Georgia Court of Appeals noted in *Whitney v. Hagen*, 65 Ga.App. 849, 16 S.E.2d 779 (1941), where two constructions of a contract phrase are possible, and one is reasonable and the other is unreasonable, the court must give the instrument the reasonable construction which would put into effect the evident

purpose of the agreement. *Whitney* 65 Ga.App. at 850, 16 S.E.2d 779. In view of the circumstances in which the present contract was executed, it is simply unreasonable to believe that the parties intended that anyone other than William Jordan, the co-founder of the company, would be empowered to buy back up to 50% of the shares in the company. Therefore, examination under the cardinal rule of construction, the intention of the parties, reveals that the plaintiffs in this case have no right to exercise the repurchase option, and defendants are entitled to summary judgment.

The court therefore concludes that plaintiffs are not entitled to assert the repurchase privilege of paragraph 9. As to count one of the complaint, which requests a declaration of the rights and duties of the parties under the contract, the court finds them to be as follows. Pursuant to paragraph 1 of the agreement, the plaintiffs as the heirs and assigns of William M. Jordan had the right to receive the purchase price listed therein. In return, the plaintiffs were obligated to turn over to the corporation, once payment was made in full, the shares of SOSCO stock then in their names. The defendants, on the other hand, had the obligation to make the payments as called for in paragraph 1 of the complaint, and had the right to receive the shares of stock when payment was made in full. With respect to paragraph 9, the repurchase provision, plaintiffs have no rights thereunder, and the defendants have no present duties thereunder, given Mr. Jordan's death. Therefore, on the issue of whether the plaintiffs are entitled to assert the provisions of the repurchase agreement, summary judgment is entered in favor of all defendants, that the plaintiffs are not entitled to assert such provision.

## C. THE MOTIONS FOR SUMMARY JUDGMENT.

Rather than consider the numerous arguments for summary judgment on the remaining counts of the complaint party-by-party, it appears to the court that the most

efficacious way of dealing with the arguments is on a count-by-count basis.

### 1. Count Two.

In count two, the plaintiffs allege that the defendants breached the contract of May 31, 1971, by refusing to permit the plaintiffs to repurchase the shares of stock previously redeemed by the company. The court's foregoing discussion makes it clear that as a matter of law this count fails, since the plaintiffs had no right to endeavor to repurchase the redeemed shares of stock. Therefore, on count two, the defendants named therein, SOSCO and Paul W. Smith, are entitled to summary judgment.

### 2. Counts Three and Four.

Count three of the complaint alleges a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Count four seeks to extend liability to individual defendants Nelson and Paul Smith on the grounds that they are "controlling persons" of SOSCO within the meaning of 15 U.S.C. § 78t. The thrust of plaintiffs' complaint in these two counts is contained in paragraph 35 of the complaint which provides as follows:

> Plaintiffs affirmatively show the Court that had they been informed of the impending acquisition of the Defendant SOSCO by the Defendant Dutch Corporation, they would have exercised their rights pursuant to paragraph 9 of the Redemption Agreement and have reacquired one-half of the outstanding stock in the Defendant SOSCO prior to the merger, sale or acquisition, thereby entitling themselves to one-half of the net proceeds of sale less the cost of acquisition of the shares.

The alleged omission which the plaintiffs assert under 10(b) and Rule 10b–5 is the failure of defendants SOSCO, Paul Smith, and Nelson, to inform plaintiffs of the negotiations for the acquisition of SOSCO by the defendants Hoek Loos Southern, Inc., N.V. W.A. Hoek's Machine-En Zuurstoffabriek (the Dutch Corporation). The defendants have argued that the plaintiffs were contractually obligated to turn over the outstanding shares of SOSCO upon payment of the purchase price listed in the 1971 agreement, and that plaintiffs have therefore failed as a matter of law to establish that they are entitled to invoke the protections of the Securities Exchange Act.

The case of *St. Louis Union Trust Company v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040 (8th Cir.1977), *rehearing and rehearing en banc denied*, Oct. 27, 1977, *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978), is illustrative in resolving the motion for summary judgment on these counts. In *St. Louis Union Trust* (hereinafter *St. Louis*), the defendant Merrill Lynch held an option to repurchase its own stock from a deceased shareholder's executors. The deceased shareholder had also been an officer of Merrill Lynch. The stock at issue contained a transfer restriction, which provided that upon the holder's death, Merrill Lynch had the option of repurchasing the stock. Merrill Lynch did exercise its option on November 18, 1970, and five months later the company went public, with an offering price to the public of approximately three times the price the company had paid under its option. The plaintiff in *St. Louis* argued that there was fraud in Merrill Lynch's purchase of the outstanding shares of their stock, in view of the plans to go public, which were not revealed to the plaintiff. The Eighth Circuit, in considering whether the plaintiff had stated a claim under the federal securities laws, first held that under the applicable state law, that of Delaware, the stock restriction providing for Merrill Lynch's option was enforceable. Similarly, in the present case, plaintiffs have put forth no evidence or argument that the May 31, 1971 agreement for SOSCO to redeem Jordan's stock was unenforceable. Turning to the federal issue, the court in *St. Louis* then considered whether plaintiff's complaint stated a claim

under Section 10(b)[4] and Rule 10b–5.[5] The court held that the plaintiff had the burden of showing a causal nexus between the defendant's wrongful conduct and the plaintiff's loss. *St. Louis* at 1048. In endeavoring to determine whether the causation requirement was met, the issue usually turns on the question of materiality. "The materiality element requires the plaintiff to show that the misrepresentation or omission would likely have influenced in reasonable or objective contemplation the seller's decision to sell." *Id.* at 1048, citing *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The court then concluded that as a matter of law, there was no causation in fact in *St. Louis. Id.* at 1049. In a highly relevant passage, the court noted as follows:

> Whatever the [decedent's] ... executors knew or did not know about a future public offering of Merrill Lynch stock was *wholly irrelevant* to their decision to sell the stock. After [the decedent] died on October 8, 1970, the decision to sell was out of their hands; they were *contractually bound* to sell ... if Merrill Lynch exercised its option. Any information concerning the public offering was not "material" in the sense that a reasonable or objective investor, in the plaintiff's circumstances, would likely have considered it important in making his decision to sell .... The defendants were thus under no obligation—and had no federal "duty" under section 10(b) and

Rule 10b–5—to disclose any information to the plaintiffs concerning the public offering when the stock restriction was enforced. *Id.* at 1049–50 (emphasis added).

The court finds the rationale of the *St. Louis* case persuasive here. Once it is established, as the court has held above, that the plaintiff was not entitled to exercise Mr. Jordan's repurchase rights under paragraph 9, then the plaintiffs were obligated to continue to comply with the terms of the 1971 contract, and sell to the defendant their shares in SOSCO. While it is true that the plaintiff might not have agreed to the accelerated payoff under the 1971 agreement had they known of the impending purchase, the effect of such a refusal would have been merely to delay the eventual outcome. Because plaintiffs' shares had a value which was fixed by the contract, knowledge of the impending acquisition would not have made a difference in the price plaintiffs were paid. *See also Ryan v. J. Walter Thompson Company,* 453 F.2d 444 (2d Cir.1971), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972).

The plaintiffs in the present case have not alleged that the 1971 contract to sell Jordan's shares to SOSCO is in any way invalid under the federal securities laws. The court therefore concludes that as a matter of law, the defendants named in counts three and four, Paul W. Smith and Lester Nelson, are not liable to the

---

**4.** Section 10(b) of the Securities Exchange Act of 1934 provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> (a) ...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**5.** Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

plaintiffs for alleged securities fraud under federal law. In order for there to be misrepresentation, the omitted fact must be "material." Because the plaintiffs were under an obligation under the contract to sell their shares anyway, no omitted fact could have been material. Therefore, summary judgment is granted in favor of defendants Nelson, Paul W. Smith, and SOSCO on counts three and four of plaintiffs' complaint.

### 3. Count Five.

■ Plaintiffs' complaint in count five alleges that defendants Nelson and Paul Smith have violated the fiduciary duty imposed upon them as officers and directors of the defendant corporation under Georgia law, by failing to disclose to the plaintiffs the pending terms and conditions of the contemplated acquisition. Plaintiffs further allege entitlement to punitive damages, and attorneys fees and costs, in this count. In support of their motion for summary judgment on this count, the plaintiffs correctly point out that the seminal case on the fiduciary duty of corporate officers and directors is *Oliver v. Oliver*, 118 Ga. 362, 45 S.E. 232 (1903). In *Oliver*, the Georgia Supreme Court held that a director, when dealing with a stockholder for the purchase of shares, is under a duty to make full disclosure of all material facts relative to the value of the property under his control.

The *Oliver* standard was restated in *Childs v. RIC Group, Inc.*, 331 F.Supp. 1078 (N.D.Ga.1970), as follows:

> In Georgia, a director occupies a fiduciary relationship to stockholders, and when the former is dealing with the latter for the purchase of shares in the corporation, he must disclose all material facts *relating to the value of the stock* learned by virtue of superior access to such information conferred by his office. *Id.* at 1081 (emphasis added).

In the present case, plaintiffs do not allege that the defendants made any material misrepresentation regarding the value of the SOSCO stock being purchased. Indeed, the value of the stock was set by contract, and plaintiffs have made no allegation that defendants violated any fiduciary duty in setting the contract price. Even had the defendants disclosed the negotiations with the Dutch Company, plaintiffs could not refuse to sell their shares under the contract, at the contract price. As before, both the complaint and plaintiffs' brief in support of their motion for summary judgment on this count reflect that it was plaintiffs' alleged option to repurchase the stock that formed the thrust of this complaint. As plaintiffs had no such option, the court concludes that the plaintiffs are not entitled to recover on the claim for the alleged violation of a fiduciary duty. *Oliver* holds that in order for liability to lie, the omission must have been material, and must have respected the value of the stock. For the same reason that any omission was not material for federal securities laws purposes, it similarly is not material on the fiduciary duty claim. Moreover, any misrepresentation did not go to the value of the stock, which was set by contract. Therefore, defendants Smith and Nelson are entitled to summary judgment on count five.

### 4. Counts Six and Seven.

The plaintiffs allege in count six that the defendant Paul W. Smith committed fraud through failure to disclose to the plaintiffs the pending acquisition.[6] Specifically, plaintiffs allege in paragraph 54 that "as a result of that fraud, the Defendant Paul W. Smith conferred upon himself an unconscionable advantage in that he doubled the value of his holdings of stock in the Defendant SOSCO to the detriment of the Plaintiffs." Count seven alleges that the defendant Dutch Corporation, together with defendant SOSCO and the other named defendants, engaged in a conspiracy to defraud the plaintiffs.

---

**6.** The court assumes that in this count plaintiffs allege common law fraud, rather than a violation of the Georgia Blue Sky law, O.C.G.A. § 10–5–12, which provides a remedy only for buyers of securities. *Kirk v. First National Bank,* 439 F.Supp. 1141 (M.D.Ga.1977).

Under Georgia law, the elements of fraud are: false representation made by the defendant; scienter; an intention to induce the plaintiffs to act or refrain from acting in reliance; justifiable reliance by the plaintiffs; and damage to the plaintiffs. *City Dodge, Inc. v. Gardner,* 232 Ga. 766, 208 S.E.2d 794 (1974). This court concludes that as a matter of law the plaintiffs have not established any damage as a result of the alleged fraud on the part of the defendants, since they received the amount due them on the contract for their shares, and plaintiffs have not alleged that the contract was entered into fraudulently. Where no damage is shown, there obviously can be no liability for conspiracy to defraud.[7] Therefore, all defendants are entitled to summary judgment on counts six and seven of the complaint.

### 5. Count Eight.

In count eight the plaintiffs assert entitlement to interest on any damages which the court may award, given that the damages are liquidated. As the court has determined that all defendants are entitled to judgment as a matter of law on all counts of plaintiffs' complaint, the plaintiffs obviously are not entitled to any damages. Therefore, the defendants are entitled to summary judgment as to count eight as well.

### D. SUMMARY.

The court concludes on count one of plaintiffs' complaint that the defendants are entitled to summary judgment as a matter of law that the plaintiffs are not entitled to assert paragraph 9 of the May 31, 1971 agreement to enable them to repurchase the shares previously redeemed by SOSCO. Because of this, as to the remaining seven counts of plaintiffs' complaint, plaintiffs are left with asserting that because the defendants did not tell them of the impending sale to the Dutch Corporation, the plaintiffs have been damaged, in

that they would not have sold their shares back to SOSCO had they known of the impending sale. The court concludes that in view of the fact that plaintiffs were obligated to sell their shares at the contract price, and they received the contract price in full, the defendants are entitled to judgment as a matter of law on counts two through eight of plaintiffs' complaint. Where, even with the disclosure, the plaintiffs would nonetheless have been obligated to perform under a contract, the defendants are entitled to judgment as a matter of law on plaintiffs' federal securities claim, common law fiduciary duty claim, and fraud claims. Therefore, the motions of all defendants for summary judgment are GRANTED as to all counts. Plaintiffs' motion for summary judgment is DENIED.

---

7. In *Horton v. Johnson,* the Georgia Supreme Court held that to sustain a civil claim for conspiracy to defraud, plaintiffs must establish injury as a proximate consequence of the conspiracy. 192 Ga. 338, 15 S.E.2d 605 (1941).